(39 Misc. Rep. 369.)

PEOPLE ex rel. STANDARD WATER METER CO. v. MONROE, Water
Supply Com'r.

(Supreme Court, Special Term, New York County.  December, 1902.)

1. MUNICIPAL CORPORATIONS — COMMISSIONER OF WATER SUPPLY — WATER
METERS.

Greater New York Charter (Laws 1897, c. 378, § 475, as amended by
Laws 1901, c. 466) provides that the commissioner of water supply, in
his discretion, may cause water meters of a pattern approved by the
board of aldermen to be placed in certain buildings.  *Held* that, while such
commissioner cannot place in a building a water meter which the alder-
men have not approved, he cannot be compelled to allow a water meter,
though so approved by the board, to be placed in a building when the
tests of his experts have shown it to be inherently defective when applied
to the proposed use.

Application by the people, on the relation of the Standard Water
Meter Company, against Robert G. Monroe, commissioner of water
supply.  Peremptory mandamus denied.

G. E. Waldo, for relator.

George L. Rives, Corp. Counsel (Arthur Sweeny, of counsel), for
respondent.

SCOTT, J.  This is a motion for a peremptory mandamus directing
the commissioner of water supply, gas, and electricity of the city of
New York to test a water meter for a customer of the relator, under
rule 13 of the department, and, if the test is satisfactory, to grant a
permit for the installation of the meter.  The relator is a manufacturer
of water meters, and makes two kinds of meters, one known as the
"disc meter" and one known as the "current meter."  The present
motion has reference to the so-called current meter.  Section 475 of
the Greater New York Charter (Laws 1897, c. 378), as amended by
chapter 466, Laws 1901, provides that:

"The commissioner of water supply is authorized, in his discretion, to cause
water meters, the pattern and price of which shall be approved by the board
of aldermen, to be placed in all stores, workshops, hotels, * * * and in
all places in which water is furnished for business consumption, and if au-
thorized thereto by resolution or ordinance of the board of aldermen, in all
apartment houses, tenements, flat houses and private dwellings, so that all
water so furnished therein or thereat may be measured and known by the
said department, and for the purpose of ascertaining the rateable proportion
which the consumers of water should pay for the water, therein or thereat
received and used."

Rule 13 of the department provides as follows:

"All meters before being placed must be sent with the owner's or pur-
chaser's name, residence and place of business to the department pipe yards
to be tested.  They will be returned within forty-eight hours, upon the written
order of the owner, giving the name of the plumber who is to receive and set
the meter."

The relator shows that its current meters have been approved as to
price and pattern by the board of aldermen, that the customer named
has purchased two of them, and that the respondent refuses to test the
two so purchased.  The answer of the respondent is that he has caused
many of the current meters manufactured by the relator to be tested,

and that he has found them to be unreliable, both as to accuracy and endurance; that he believes said meters to be unfit for use under conditions such as exist in this city; and that, even if the particular meters said to have been purchased should apparently respond to the tests to be applied to them in the pipe yard, still he should deem it unwise to permit any meters of that description to be installed. Hence, as he says, it would be futile to test the meters. It appears that in January of the present year the relator applied to the then commissioner of water supply for leave to sell its meters in this city. This application referred to both disc and current meters. The commissioner, on January 22d, addressed a communication to the board of aldermen, recommending for approval the pattern and price of water meters manufactured by relator, stating that these meters had been tested, and found to be reliable, accurate, and durable. There seems to be some reason to believe that the commissioner only intended to include the relator's disc meters in this recommendation. However that may be, at his suggestion further tests of the current meter were made, and the results, which the respondent and his engineers declare to have been unsatisfactory, were submitted to the board of aldermen. On July 7, 1902, the board adopted a resolution approving relator's water meters as to price and pattern. This resolution seems to have applied to both disc and current meters. Subsequently a further number of current meters were tested under the direction of the respondent, and again, as he claims, they proved to be inaccurate and unreliable. The question at issue turns upon the meaning to be given to the charter provision that "the commissioner of water supply is authorized, in his discretion, to cause water meters, the price and pattern of which shall be approved by the board of aldermen. to be placed in all stores," etc. That he has an undoubted discretion to determine in what particular buildings, of the character enumerated in the section, water meters shall be placed, is undoubted. The relator insists that this is the limit of his discretion, and that, having determined that a meter shall be placed in a building, he is bound to permit any meter to be placed therein that the owner may prefer, provided only that it be of a style or make the pattern and price of which has been approved by the board of aldermen, and subject to a brief test, not exceeding 48 hours, of the particular meter sought to be installed. The respondent, on the other hand, contends that his discretion is much wider, and extends to the pattern of meter to be used, subject only to the qualification that he may not approve or authorize any meter unless it has been approved as to price and pattern by the board of aldermen. In other words, that while he may not authorize any meter not approved by the board, his judgment as to the propriety of using a particular pattern of meter is not taken away or controlled by the board, but that a meter to be used must be approved both by himself and the board of aldermen. It is to be noted that the purpose of using water meters is declared by the statute to be that the water used may be measured and used by the depart-ment, and that the consumers thereof shall pay therefor ratably. To achieve these ends it is necessary that the meters to be used shall not only be accurate for a short period, but that they shall be of a pattern which will insure durability and continued reliability. Given a pattern

which has been shown to usually possess these attributes, it is reasonable that a short test may be all that is necessary to show that a particular meter of that pattern is fit to be used. It is conceivable, however, that meters may be made, which, from inherent defects in their general design, are likely to prove to be inaccurate and unreliable after continued use, although individual meters might appear to respond favorably to short tests. Whether a meter is thus inherently defective in design is a matter which can only be determined by trained experts, who have had experience in such matters. The charter contemplates that the commissioner of water supply shall have at all times in his department expert engineers to advise upon just such questions as this. He is therefore provided by law with the means of acquiring such information as may be necessary to enable him to determine whether or not any pattern of meter is one which is calculated to achieve the purposes prescribed by the charter, and therefore whether or not the public interests would be conserved by its use. The board of aldermen are not elected for their scientific attainments, and are not provided by law with expert advisers.

It would require a very clear reading of the statute to induce the belief that upon so highly technical and scientific a question as the sufficiency of the plan or pattern of a water meter the legislature intended to intrust the ultimate answer to the board of aldermen, to the total exclusion of the commissioner of water supply and his trained staff of experienced engineers. In my opinion, the charter does not require such a reading, or justify such a conclusion as to the intention of the legislature. On the contrary, all that the legislature meant, as I construe the statute, was that the board of aldermen should act as a check upon the commissioner, so as to prevent him from imposing upon consumers meters of too cumbersome a design, or of too high a price, leaving him, as between the patterns approved by the board, free to exercise his own discretion as to which meters would satisfy the requirements of the section quoted. This view of the intention of the legislature is confirmed by the course of legislation upon the subject. By section 13 of chapter 383 of the Laws of 1870 the commissioner of public works was left free to select any meter "of approved pattern and suitable for the purpose." By the charter of 1873 (Laws 1873, c. 335, § 73) the pattern and price of water meters was required to be approved by the mayor, comptroller, and chief engineer of the Croton aqueduct, and this provision was re-enacted and continued by the consolidation act (Laws 1882, c. 410, § 352). By the first charter of the Greater New York it was required that the price and pattern should be approved by the board of public improvements, and by the present charter the power of approval is given to the board of aldermen. Thus, as will be seen, the power to approve price and pattern was first given to the commissioner alone, then to a board comprising one expert engineer and two laymen, then to a board composed of six commissioners presiding over departments employing engineers, and nine officers not necessarily employing expert assistants, and finally the power is lodged in a legislative body. Thus the legislature has gradually withdrawn the

matter of the approval of price and pattern more and more from those who, from their official positions, might be supposed to be able to pass upon the technical and scientific questions involved in the selection of a proper water meter. I cannot believe that it has been the persistent policy of the legislature to submit the final determination of a purely scientific question to successive bodies not presumptively possessing scientific knowledge and experience. It seems much more reasonable to assume that the purpose has been to establish a check upon the power of the commissioner to impose upon consumers extravagant expenditures for meters. The affidavits show that the respondent has acted in perfect good faith, and after numerous tests has concluded that current meters are inherently defective when applied to house uses under such conditions of pressure and flow as obtained in this city. In this opinion he is sustained and fortified by the expert opinion of the engineers of his department. In refusing to consent to the installation of such meters he is acting, in my opinion, within the discretion vested in him, and that discretion the court will not review.

Motion denied, with $10 costs.